UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN KEITH SCHWAB,

        Plaintiff,

                                  Case No. 1:20-cv-484

                                  Hon. Janet T. Neff

CORIZON HEALTH, *et al.*,

        Defendants.

_____/

### REPORT AND RECOMMENDATION

Plaintiff Brian Schwab ("Schwab") is a prisoner in the custody of the Michigan Department of Corrections (MDOC). This lawsuit involves events which occurred while he was incarcerated at the Kent County Correctional Facility ("KCCF"). He has filed a lawsuit against the following defendants for alleged violations of his civil rights pursuant to 42 U.S.C. § 1983 related to his medical care at KCCF: Corizon Health, Inc.; Nazim Yacob, M.D. (named as "Unknown Yacob"); Gregory Flentje, M.D. (named as "Unknown Flentje"); Joanne Sherwood, N.P. (named as "Joanne Sheerwood"); and Kent County Sheriff Michelle LaJoye-Young (named as "Michelle Young"). This matter is now before the Court on motions for summary judgment filed by defendants Corizon Health, Inc. ("Corizon"), Dr. Yacob, Dr. Flentje, and NP Sherwood (collectively the "Corizon defendants") (ECF No. 56) and Sheriff LaJoye-Young (sometimes referred to as the "Sheriff") (ECF No. 60).

### I.      The complaint

Schwab did not set out any counts in his complaint. *See* Compl. (ECF No. 1). The complaint includes narratives told in "facts," numerous "notes to facts" (case citations), "legal

1

claims" (more citations), and a prayer for relief.  *Id*.  The gist of Schwab's complaint is that defendants violated his Eighth Amendment rights.[1]  The Court gleans the following Eighth Amendment claims from the complaint.[2]

### A.    Defendants failed to prescribe medication

Dr. Flentje denied Schwab his "prescribed medication for A.D.H.D. and P.T.S.D. and psychotic disorder claiming Michelle Young wont [sic] authorize them because they are expensive."  *Id*. at PageID.7.  Corizon, Dr. Yacob, NP Sherwood and the Sheriff caused Schwab pain by failing to provide muscle relaxers and anti-inflammatory drugs which he was prescribed before his incarceration.  *Id*. at PageID.8.

### B.    Defendants charged co-pays for medication and tests

NP Sherwood ordered a soy allergy test and charged Schwab for the test.  *Id*. at PageID.7. "Defendants" charged Schwab $7.00 to see a nurse, $12.00 to see a doctor, "$7.00 a week for muscle relaxers which were denied", $7.00 a week for Motrin, $7.00 a week for anti-inflammatories, $6.00 a week for prostate medication, and "$7.00 for my Myrilax."  *Id*. at PageID.8.

### C.    Defendants failed to treat Schwab's constipation related to soy diet

The KCCF served soy products which made Schwab constipated.  NP Sherwood put Schwab on a medication "that did not help," removed him from the medication, and placed him on a "no soy diet."  Compl. at PageID.5.  Because Schwab did not have a soy allergy,

---

[1] The parties appear to agree that Schwab was not a pre-trial detainee at the time of the incidents at the KCCF and that the Eighth Amendment applies to his claims.  Even if Schwab was a pre-trial detainee, the same legal standard applies under § 1983.  See *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004) ("Whether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983.").

[2] In addition to the groups of complaints listed below, Schwab refers to "the loss of dentures."  *See* Compl. at ¶ 34, PageID.12.  However, he does not explain how defendants, none of whom are dentists, are responsible for this treatment.

2

defendants Corizon and the Sheriff removed him from the "no soy diet". *Id.* This caused Schwab to become constipated "with roughly 0-1 Bowel movements a week and constant cramps and pains." *Id.*

### D.    Defendants failed to treat Schwab's chronic back problems

The Sheriff's policy for medical care, as well as Dr. Jacob and NP Sherwood, failed to provide Schwab with accommodations such an extra mattress, tennis shoes and physical therapy of Schwab's "chronic back problems." *Id.* at PageID.7. NP Sherwood denied Schwab "a second mattress, and shoes" and would not take him for an "MRI exam or test to check the back problem." *Id.* Dr. Yacob, NP Sherwood and the Sheriff denied Schwab physical therapy. *Id.* at PageID.13.

### E.    Defendants failed to provide mental health treatment

The gist of Schwab's claim is that Dr. Flentje violated the Eighth Amendment by treating his serious mental health needs with "cheaper" medication "that doesn't work." *Id.* at PageID.11.

### F.    Relief requested

Schwab seeks "a declaration that the acts and omissions described herein violate his rights under the constitution and laws of the United States as well as tort law." *Id.* at PageID.23. Schwab seeks compensatory and punitive damages of $500,000.00 ($100,000.00 from each defendant). *Id.* [3]

---

[3] Schwab also included allegations that he is has a physical or mental impairment which substantially limits one or more of his major life activities and that he is protected under the Americans with Disabilities Act (ADA). *See* Compl. at ¶¶ 41-48, PageID.14-15. Schwab alleged that defendants Dr. Yacob, NP Sherwood, Dr. Flentje and the Sheriff "refuse to care for plaintiffs [sic] needs." *Id.* at ¶ 48, PageID.15. While Schwab has referred to the ADA, this brief reference does not present a claim under the ADA. *See, e.g., Vick v. Core Civic*, 329 F. Supp. 3d 426, 443 (M.D. Tenn. 2018) ("[The ADA is] not . . . violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. . . The ADA does not create a remedy for medical malpractice.") (quoting *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

## II.      Defendants' motions for summary judgment

### A.      Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, the Court is not bound to blindly adopt a non-moving party's version of the facts.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

4

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.    Eighth Amendment claims

Schwab seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law."  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (1976).  A viable Eighth Amendment claim consists of an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind.  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  The objective component requires the infliction of serious pain or failure to treat a serious medical condition.  *Id.* at 8-9.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.*  at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).

5

To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 1.    Failure to provide previously-prescribed medication

Schwab alleged that defendants caused him pain by failing to provide muscle relaxers, anti-inflammatory drugs, as well as medication for ADHD, PTSD, and a psychotic disorder which he was prescribed before his incarceration at KCCF.  There is no evidence to support Schwab's allegation that he was receiving these medications prior to his incarceration at KCCF.  In his KCCF Medical Screening Form dated August 14, 2018,  Schwab denied that he was currently receiving medical treatment for a medical condition, denied that he was under a physician's care, and denied that he was taking any medications.  Medical Screening Form (ECF No. 57, PageID.410).  Schwab also denied bringing any medications to the KCCF, as confirmed by his Medical Verification Form (listing "No meds"). *Id.* at PageID.410, 413, 416.  Accordingly, defendants should be granted summary judgment with respect to this claim.

### 2.    Medication co-pays

Schwab's Resident Account Summary of purchases made while at KCCF include some medical charges (ECF No. 62-2, PageID.741-749, 774-776, 784-785).  While Schwab paid some minor medical expenses, he was not denied care based on his inability to pay the expenses. In this regard, the Kent County Jail Medical Unit form for "Patient Charges" states that

"MEDICAL CARE WILL NOT BE DENIED DUE TO INABILITY TO PAY." *See* Patient

Charge Form (April 21, 2019) (ECF No. 62-2, PageID.767) (emphasis in original). Schwab's

claim should be denied because he neither alleged nor presented evidence that defendants denied

him medical care due to his inability to afford a medical co-pay. "It is constitutional to charge

inmates a small fee for health care where indigent inmates are guaranteed service regardless of

ability to pay." *White v. Correctional Medical Services, Inc.*, 94 Fed. Appx. 262, 264 (6th Cir.

2004). *See Shapley v. Nevada Board of State Prison Commissioners*, 766 F.2d 404, 408 (9th Cir.

1985) (the complaint did not state a claim for deliberate indifference when the prisoner failed to

allege that he was denied medical treatment because he could not pay a $3.00 fee for a medical

visit). Accordingly, defendants should be granted summary judgment on this claim.

### 3.    The three medical providers

Dr. Yacob, NP Sherwood and Dr. Flentje each prepared an affidavit setting out the

treatment provided to Schwab while he was at the KCCF. The affidavits and medical records

demonstrate that Schwab received a significant amount of medical treatment while at the KCCF.

### a.    Dr. Yacob

Dr. Yacob had the following interactions with Schwab with respect to his physical

ailments, specifically his chronic back problems and constipation.

On August 23, 2018, the doctor reviewed Schwab's health assessment performed

by the nursing staff and noted that Schwab did not have any mobility restrictions or physical aids

and that his mood was unremarkable. Dr. Yacob Aff. (ECF No. 56-2, PageID.394); Medical

Records (ECF No. 57-1, PageID.419-420).

On August 26, 2018, the doctor ordered a bottom bunk detail due to Schwab's recent back surgery, but concluded that a second mattress was not warranted.  Dr. Yacob Aff. at PageID.394; Medical Records at PageID.446.

On October 13, 2018, Dr. Yacob evaluated Schwab's medical condition:

> I evaluated Mr. Schwab who reported a history of chronic back pain for eighteen years resulting from a car accident. Mr. Schwab also reported a history of dizziness and blacking out that Mr. Schwab reported to be side effects of his medications and not from seizures, as he had stopped Dilantin in January of that year when he last got out of prison. I noted Mr. Schwab's condition was stable. I discontinued Dilantin, ordered Naprosyn 375 mg twice a day for 15 days, comprehensive metabolic panel lab draw, and a follow up appointment for 90 days.

Dr. Yacob Aff. at PageID.394; Medical Records at PageID.438-440.

On March 18, 2019, per Dr. Flentje, Dr. Yacob ordered Schwab's Geodon 80mg be renewed for 90 days.  Yacob Aff. at PageID.394.

On January 6, 2020, Dr. Yacob reviewed x-ray results of Schwab's lumbar spine "which showed normal lordosis of the lumbar spine with no subluxation, no compression deformities, and no mass demonstrated radiographically."  Yacob Aff. at PageID.394.

On April 22, 2020, Dr. Yacob reviewed Schwab's lab report which showed that he did not have a soy allergy.  Yacob Aff. at PageID.394.

On June 20, 2020, Dr. Yacob changed Schwab's order for Miralax from 30 days to 15 days.  Yacob Aff. at PageID.394; Medical Records at PageID.505.

In summary, the record reflects seven interactions between Dr. Yacob and Schwab, which included an examination, issuing accommodations, adjusting medication, and reviewing diagnostic tests.

**b.    NP Sherwood**

NP Sherwood saw Schwab multiple times for complaints of back pain and constipation.  Sherwood treated these conditions by ordering medications, an ultrasound of the lower back, and an x-ray of the lumbar spine.  When Schwab reported no relief with the medication for his constipation, Sherwood adjusted the medication and ordered an allergy test for soy to see if this was the cause of the constipation.  When Schwab's allergy test was negative, Sherwood provided him with Lactulose. In her affidavit, NP Sherwood identified the following interactions with Schwab:

> 3. On October 17, 2018, I was notified by the nursing staff that Mr. Schwab complained of penile discharge from what he believed was a side effect from his Geodon and Effexor prescription. I ordered a urinalysis in response to Mr. Schwab's complaints. The results of the urinalysis showed no abnormal results aside from a slightly high urine pH. [Medical Records at PageID.443-444]
>
> 4. On October 26, 2018, I saw Mr. Schwab for a follow up visit. Mr. Schwab requested extra food and shoes. I ordered weekly weights for Mr. Schwab for eight weeks. [Medical Records at PageID.445, 458[4]]
>
> 5. On November 14, 2018, I saw Mr. Schwab for a follow up visit. Mr. Schwab reported being cold "almost his whole life," dizziness, difficulty urinating, constipation, and a mood disorder. I ordered psych to see Mr. Schwab due to his request for increased Effexor dose. I also ordered PSA and CBC labs and Fiberlax for 30 days. [Medical Records at PageID.450, 458]
>
> 6. On November 15, 2018, I ordered Mr. Schwab to be evaluated by psych regarding his request for an increased dose of Effexor. I ordered labs and Fiberlax for 30 days. [Medical Records at PageID.458]
>
> 7. On December 17, 2018, I ordered psych to see Mr. Schwab regarding his request for an increased dose for his medications. [Medical Records at PageID.459]
>
> 8. On December 21, 2018, I saw Mr. Schwab for complaints of diet problems and chronic constipation. I noted that Mr. Schwab indicated he does not have these symptoms when he avoids soy and gets no relief when taking Fiberlax and Colace. On examination, Mr. Schwab's abdomen was soft with hyperactive bowel sound, diffusely tender, with no edema. Mr. Schwab noted he had been on a vegan diet with relief. I ordered a no soy diet. [Medical Records at PageID.450, 459]

---

[4] The Court notes that Schwab complained that he was losing weight.  NP Sherwood ordered that Schwab was to be weighed weekly for eight weeks.

9. On March 6, 2019, I saw Mr. Schwab for a follow up visit regarding his chronic back pain. Mr. Schwab stated he had a back brace, several surgeries regarding his complaints, and was sent to physical therapy and a pain clinic. I ordered Robaxin and Mobic for Mr. Schwab's complaints.  [Medical Records at PageID.461]

10. On March 7, 2019, I ordered Robaxin 750mg for seven days, Mobic, 7.5 mg for 30 days, and noted Mr. Schwab may have a new mat if one was available.  [Medical Records at PageID.462]

11. On March 14, 2019, I discharged Robaxin as it was not approved by the regional medical director. [Medical Records at PageID.462]

12. On September 25, 2019, Mr. Schwab presented for a follow up visit. I noted Mr. Schwab had a mass on the left side of his lower back. I documented Mr. Schwab's history of low back pain due to a motor vehicle accident at the age of 16. I noted Mr. Schwab had Mobic and a firm mass on the left side of his lower back. I ordered an ultrasound for the mass on his left lumbar tissue and Mobic 7.5mg for 30 days.  [Medical Records at PageID.470, 479]

13. On December 30, 2019, Mr. Schwab presented for follow up visit regarding his continued back pain. Mr. Schwab stated the Mobic helped for a while but was now less effective. I documented the ultrasound of his back that I ordered had not been completed. On examination, I documented Mr. Schwab's gait was steady, speech was clear, and a firm mass under skin in left lumbar area was painful to palpation. I ordered x-rays of the lumbar spine, ultrasound for the mass on Mr. Schwab's left lumbar area, and Naprosyn 375 mg for 30 days.  [Medical Records at PageID.480, 489]

14. On January 30, 2020, Mr. Schwab presented for a follow up regarding his ongoing back pain. I ordered a bottom bunk for Mr. Schwab.  [Medical Records at PageID.480, 489]

15. On April 2, 2020, I saw Mr. Schwab for a follow up visit. Mr. Schwab requested testing for soy allergy. Mr. Schwab complained he was unable to get commissary money to supplement his diet. I ordered soy allergy testing.  [Medical Record at PageID.493, 498]

16. On April 30, 2020, Mr. Schwab presented for a follow up complaining of constipation. Mr. Schwab reported he was not getting relief with Colace, Fiberlax, or Dulcolax and requested Miralax. Mr. Schwab also requested shoes so he could get medical shoes when he transfers to the custody of the Michigan Department of Corrections. On examination, I noted Mr. Schwab's abdomen was soft, nontender, with bowel sounds decreased in all four quadrants. A genitourinary examination was deferred. I ordered Miralax for 30 days. [Medical Records at PageID.493, 500]

17. On June 3, 2020, I ordered Miralax for 30 days.   [Medical Records at PageID.500]

18. On June 11, 2020, Mr. Schwab presented for complaints of constipation stating "he had no urge to go." Mr. Schwab informed me that his primary care physician prescribed Miralax and Fibrolax, Dulcolax, and Colace did not work. Mr. Schwab reported two to three bowl movements per day with no diarrhea or abdominal cramping. I advised Mr. Schwab Miralax was not likely to be an option going forward and documented Mr. Schwab would accept Lactulose instead. Mr. Schwab was instructed to increase activity and water intake.   [Medical Records at PageID.499]

19. On July 17, 2020, I discontinued Mr. Schwab's Colace and ordered 30mL of Lactulose for 30 days. [Medical Records at PageID.505]

NP Sherwood Aff. (ECF No. 56-4). In summary, the record reflects 17 interactions between NP Sherwood and Schwab, which included examinations, adjusting medications, and ordering tests including an ultrasound, an x-ray, and a soy allergy test.

### c.    Dr. Flentje

Dr. Flentje evaluated Schwab on September 19, 2018, and prescribed Geodon and Effexor to treat his mental condition. As part of his treatment, the doctor evaluated Schwab periodically, and renewed and adjusted Schwab's medications as necessary. In his affidavit, Dr. Flentje identified the following interactions with Schwab:

3. On September 19, 2018, I met with Mr. Schwab for a psychiatric visit. I documented Mr. Schwab was alert and oriented, cooperative but mildly agitated, distracted, and hypervigilant. I noted Mr. Schwab had PTSD but could present as psychotic. I also noted Mr. Schwab was hypervigilant, mildly anxious, and distracted. Mr. Schwab described his mood as depressed and paranoid, but he did not express suicidal ideation. Mr. Schwab complained of auditory and command auditory hallucinations. Based on Mr. Schwab's presentation, there was no evidence that he had any auditory or command auditory hallucinations. I prescribed Geodon and Effexor and ordered laboratory draws. I ordered routine referrals for mental health clinician and psychiatrist, and an urgent mental health nurse referral. [Medical Records at PageID.428-431, 446]

4. On November 6, 2018, I entered a verbal order for Catapres 0.1mg for 90 days. [Medical Records at PageID.458]

5. On December 18, 2018, I met with Mr. Schwab for a psychiatric visit. Mr. Schwab stated he was "alright at the moment" and complained he received the wrong medications. I documented Mr. Schwab was alert and oriented times three, calm, cooperative, and in no apparent distress. I increased Mr. Schwab's Effexor, Geodon, and Catapres.  [Medical Records at PageID.455-457, 459]

6. On February 5, 2019, I increased Mr. Schwab's Effexor to 300mg for 90 days. [Medical Records at PageID.462]

7. On March 19, 2019, I met with Mr. Schwab for a psychiatric visit. During this visit, I noted Mr. Schwab had significantly improved with his increased dose of Effexor. I ordered Mr. Schwab to follow up with the mental health clinician and psychiatrist on a routine basis.  [Medical Records at PageID.463-465]

8. On May 1, 2019, I renewed Mr. Schwab's Effexor 300mg for 90 days.  [Medical Records at PageID.468]

9. On June 13, 2019, I renewed Mr. Schwab's Geodon 80mg for 90 days and Catapres 0.1 mg for 90 days.  [Medical Records at PageID.468]

10. On June 18, 2019, I met with Mr. Schwab for a psychiatric visit. I noted that Mr. Schwab's PTSD was stable, he was alert and oriented times three, calm, cooperative, and in no apparent distress. Mr. Schwab was referred to routine follow up with the psychiatrist.  [Medical Records at PageID.473-475]

11. On August 12, 2019, I renewed Mr. Schwab's medication for Effexor 300mg. [Medical Records at PageID.479]

12. On August 22, 2019, I renewed Catepres 0.1mg for 90 days.  [Medical Records at PageID.479]

13. On September 12, 2019, I met with Mr. Schwab for a psychiatric visit. I noted Mr. was alert and oriented times three, calm, cooperative, and in no apparent distress. I noted Mr. Schwab's PTSD and major depressive disorder was stable. Mr. Schwab was referred to routine follow up with the psychiatrist.  [Medical Records at PageID.476-478]

14. On October 24, 2019, I renewed Mr. Schwab's Effexor 300mg for 90 days. [Medical Records at PageID.479]

15. On November 1, 2019, I renewed Mr. Schwab's Geodon 80mg for 90 days. [Medical Records at PageID.479]

16. On November 25, 2019, I renewed Mr. Schwab's Catapres 0.1mg medication for 90 days.  [Medical Records at PageID.489]

17. On December 17, 2019, I met with Mr. Schwab for a psychiatric visit. I documented Mr. Schwab was missing many of his morning doses of his medication regimen. Mr. Schwab was stable and was referred to routine follow up with the psychiatrist.  [Medical Records at PageID.482-484]

18. On January 16, 2020, I renewed Mr. Schwab's prescription for Effexor 300mg for 90 days. [Medical Records at PageID.489]

19. On January 23, 2020, I renewed Mr. Schwab's Geodon 80mg for 90 days. [Medical Records at PageID.489] [Schwab refused the "Geodon 80" on January 17, 2020, Medical Records at PageID.488]

20. On February 27, 2020, after reviewing the nursing notes, I changed Mr. Schwab's Catapres medication to the 4:00 a.m. and 4:00 p.m. medline for 90 days. [Medical Records at PageID.498]

21. On April 12, 2020, I renewed Mr. Schwab's medication for Geodon 80mg and Effexor 300 mg.  [Medical Records at PageID.498]

22. On May 18, 2020, I met with Mr. Schwab for a psychiatric visit. I noted Mr. Schwab was alert and oriented times three, calm and cooperative, and in no apparent distress. Mr. Schwab's thought process and content was unremarkable. [Medical Records at PageID.503-504]

23. On May 21, 2020, I renewed Mr. Schwab's Catapres medication for 90 days. [Medical Records at PageID.500]

24. On June 17, 2020, I met with Mr. Schwab for a psychiatric visit. I increased Mr. Schwab's Geodon to 80 mg in the morning and 120 mg at night for 90 days and ordered an urgent mental health nursing visit.  [Medical Records at PageID.507-509]

25. On July 12, 2020, I renewed Mr. Schwab's Effexor for 90 days.  [Medical Records at PageID.510]

Dr. Flentje Aff. (ECF No. 56-3, PageID.397-399).  The record reflects at least 22 interactions between Dr. Flentje and Schwab which included examinations and adjusting medications.  These medications were referenced when Schwab was transferred to the MDOC.  *See* Intra-System Transfer Form (ECF No. 59).

        **d.**      **Discussion**

### i.    Schwab's complaint and affidavits do not create genuine issues of material fact

Schwab has presented four documents to oppose defendants' motion for summary judgment.  As an initial matter, he filed a "verification" with his complaint (Compl. at PageID.24).  *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment).  Then, he filed three affidavits in response to the motion for summary judgment: "Re: Treatment of Chronic Back Issues" (ECF No. 66-1); "Re: Mental Health Treatment" (ECF No. 66-2); and "Re: Medical Treatment of Several Issues" (ECF No. 66-3).

As discussed, Schwab's complaint consisted of some factual allegations, with numerous legal citations and legal arguments.   Schwab's complaint is not a verified complaint with respect to the facts.   Schwab attempted to verify his complaint pursuant to 28 U.S.C. § 1746(2), which provides that in any matter which

> is required or permitted to be supported, evidenced, established, or proved by the sworn declaration . . . or affidavit, in writing of the person making the same . . . may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration . . . or statement, in writing of such person which is subscribed by him, as true under penalty of perjury.

Such statements must be made in substantially the following form, "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".  28 U.S.C. § 1746(2).  Here, Schwab's "verification" is not in the form required by the statute.  Rather, his verification which includes additional provisions as follows:

> I have read the foregoing complaint and hereby verify that the matters alleged there in are true except as to matters alleged on information and belief, and as to those, I believe them to be true.  I certify under penalty of perjury that the foregoing is true and correct.

Compl. at PageID.24.  Schwab's verification is a diluted version of the form of the straightforward language required by the statute.  Accordingly, the complaint is not "verified" and does not have the same force and effect as an affidavit for purposes of responding to the motions for summary judgment.

Next, none of Schwab's affidavits filed in response to the motions for summary judgment create genuine issues of material fact.  In each affidavit, Schwab recites that after being duly sworn, he states under penalty of perjury that the statements are true "to the best of his [or my] knowledge and belief."  *See* Affidavits at PageID.827, 835, and 844. Summary judgment cannot be granted on facts based upon a person's "belief."  *See Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) ("statements made on belief or on information and belief, cannot be utilized on a summary-judgment motion") (internal quotation marks omitted).

### ii.    Schwab's claims fail on the merits

Furthermore, even if Schwab's complaint and affidavits were adequate to address factual issues on summary judgment, Schwab's claims fail.  As discussed, defendants identified dozens of interactions with Schwab regarding his medical conditions.  Dr. Yacob and NP Sherwood provided Schwab with a variety of treatments to address his claims related to his physical ailments which included chronic back pain, constipation, a possible soy allergy, and a penile discharge.   In addition, Dr. Flentje met with Schwab on eight occasions[5] to evaluate his mental health and adjusted his medication as necessary.  Schwab's affidavits do not dispute that he received the medical c

---

[5] As discussed, Dr. Flentje met with Schwab on Sept,19, 2018; Dec. 18, 2018; March 19, 2019; June 18, 2019; Sept. 12, 2019; Dec. 17, 2019; May 18, 2020; and June 17, 2020.

are as set forth above.  The affidavits refer to portions of the medical record and point out instances when the medical staff failed to provide Schwab with items or treatment that he wanted.

"[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law."  *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted).  Based on the medical records, there is no evidence that Dr. Yacob, NP Sherwood or Dr. Flentje exhibited obduracy or wantonness in treating Hill, or exhibited a mental state equivalent to criminal recklessness. *See Whitley*, 475 U.S. at 319; *Santiago*, 734 F.3d at 591.  To the extent that Schwab disagreed with the treatment provided, his disagreement with that treatment or his desire for additional or different treatment, does not support an Eighth Amendment claim.  *Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018).  "[A] patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017).

Finally, the record reflects that Schwab refused medical care offered to him at various times during his incarceration: Oct. 12, 2018 (refused Naproxen and Dilantin, Medical Records at PageID.441); March 29, 2019 (refused Mobic, PageID.466); July 7, 2019 (refused medications, PageID.471); Aug. 7, 2019 (refused medication, PageID.472); Jan. 17, 2020 (refused Geodon 80 mg, PageID.488); Feb. 5, 2020 (refused medication, PageID.491); and, on June 11, 2020 (refused to have blood drawn for laboratory services, PageID.506). Schwab cannot claim that medical providers were deliberately indifferent to his serious medical needs when he refused medication and a diagnostic testing.

A voluntary refusal of treatment precludes an Eighth Amendment claim.  *Palmer v. Wagner,* 3 Fed. App'x 329, 331 (6th Cir. 2001).   Prison officials are not

> deliberately indifferent to a prisoner's serious medical needs when the prisoner refuses to accept medical treatment. *See, e.g., Richard v. Bokor*, 379 Fed. Appx. 719, 720-22 (10th Cir. 2010) (prisoner failed to state a claim for deliberate indifference where he thwarted medical personnel's efforts by disrupting the medical visits and refusing the offered treatment)[.]

*Johnson v. Allen*, No. 1:15-cv-1329, 2016 WL 860428 at *4 (W.D. Mich. March 7, 2016).

For all of these reasons, defendants Dr. Yacob, NP Sherwood, and Dr. Flentje should be granted summary judgment on Schwab's Eighth Amendment claims.

### 4.    Corizon

Private corporations performing state functions, such as Corizon, cannot be held liable under § 1983 on a theory of vicarious liability. *See Street v. Corrections Corporation of America*, 102 F.3d 810, 817-18 (6th Cir. 1996), citing *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under the rule set forth in *Monell*, while a plaintiff may seek damages against a government entity (in that case a municipal corporation), those damages cannot be premised upon vicarious or respondeat superior liability. *Monell*, 436 U.S. at 691-93. Rather, a plaintiff must establish that a municipal custom, policy, or practice resulted in the deprivation of his constitutional rights. *Id*. at 690-91.

Schwab's Complaint alleged that Corizon: (1) "came up with the idea" that if you did not have a soy allergy you could not be on a no soy diet because of the cost of a no soy diet (PageID.5); (2) denied him medical care (PageID.8); (3) charged Schwab for medical services "when he is the property of the Michigan Dep't of Corrections" (PageID.8); (4) refused to let him have "things used in physical therapy" (PageID.13); (5) ordered that his medication be crushed (PageID.15); and, (6) failed to adequately treat his mental health conditions and failed to provide medication (PageID.16-17).

None of these allegations identify an unconstitutional policy or custom.  Schwab has presented no evidence that Corizon established restrictions on the food served at the KCCF.  As discussed, the policy of charging a small fee for medical expenses does not violate Schwab's constitutional rights.  The balance of Schwab's claims seek to hold Corizon responsible under a theory of respondeat superior for treatment provided by the medical staff at the KCCF, including Dr. Yacob, NP Sherwood, and Dr. Flentje.  Accordingly, Corizon should be granted summary judgment.

### 5.        Sheriff LaJoye-Young

In his complaint, Schwab states that he is suing Sheriff LaJoye-Young in both her official and personal capacity.  Compl. at PageID.2.

"Personal involvement is necessary to establish section 1983 liability." *Murphy v. Grenier*, 406 Fed. Appx. 972, 974 (6th Cir. 2011).  Here, the Sheriff had no personal contact with Schwab while he was incarcerated at the KCCF and she did not provide him with any medical services.  *See* Sheriff LaJoye-Young Aff. (ECF No. 61-2, PageID.552).  As discussed, Corizon provided medical services at the KCCF, with Dr. Yacob, NP Sherwood, and Dr. Flentje treating Schwab.  Accordingly, Sheriff LaJoye-Young should be granted summary judgment on Schwab's Eighth Amendment claims related to actions performed in her personal capacity claims.

Schwab also alleged that the Sheriff took actions in her official capacity, referencing various alleged "policies".  *See, e.g.*, Compl. at ¶ 4, PageID.5 (policy regarding soy diet); ¶ 9 at PageID.7 (policy to "refuse to allow me to be adequately treated for my medical needs"); and, ¶ 15 at PageID.8 (policy to charge for medical services).  As this Court explained,

> In matters pertaining to the conditions of the jail and to the operation of the deputies, the sheriff is the policymaker for the county. Mich. Comp. Laws § 51.75 (sheriff has the "charge and custody" of the jails in his county); Mich. Comp. Laws § 51.281 (sheriff prescribes rules and regulations for conduct of prisoners); Mich.

> Comp. Laws § 51.70 (sheriff may appoint deputies and revoke appointments at any time); *Kroes v. Smith*, 540 F. Supp. 1295, 1298 (E.D.Mich.1982) (the sheriff of "a given county is the only official with direct control over the duties, responsibilities, and methods of operation of deputy sheriffs" and thus, the sheriff "establishes the policies and customs described in *Monell*" ). Thus, the Court looks to the allegations in Plaintiff's complaint to determine whether Plaintiff has alleged that the sheriff has established a policy or custom which caused Plaintiff to be deprived of a constitutional right.

*Price v. Bailey*, No. 1:09-cv-12, 2009 WL 198962 at *2 (W.D. Mich. Jan. 26, 2009).

Schwab's claims are without merit.  First, with respect to Schwab's claim regarding a soy diet policy, he has not established the nature of the alleged policy or that it violates any constitutional right.  Second, Schwab has not presented evidence of a policy to deny him adequate treatment for his medical needs. In this regard, medical staff, including Dr. Yacob, NP Sherwood, and Dr. Flentje treated Schwab's medical needs.  Third, as discussed, a policy requiring a medical co-pay or small fee for medical services is not unconstitutional.  Accordingly, Sheriff LaJoye-Young should be granted summary judgment on Schwab's official capacity claims.

## IV.    State law claims

Schwab's complaint includes references to violations of state law.  For example, Schwab alleged that

> Dr. Flentje, Dr. Yacob, Joanne Sheerwood [sic] and [non-party] Corizon Health Nurses employed at the Kent County Jail are guilty of the wrong of negligence causing injury for commiting [sic] the civil wrong involving the breach of duty to exercise reasonable care of plaintiffs [sic] medical needs.

Compl. at ¶ 55, PageID.16.  The Court exercised its supplemental jurisdiction over Schwab's state law claims pursuant to 28 U.S.C. § 1367, presumably because these claims were intimately related to the alleged federal constitutional violations.  *See* 28 U.S.C. § 1367(a) ("the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy").

If the Court adopts the recommendation to grant defendants' motion for summary judgment, then I further recommend that Schwab's state law claims be dismissed.  Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction."   In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion General Hospital, Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, where a district court has exercised jurisdiction over a state law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state law claims. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007) ("Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims.").   "Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (internal quotations omitted). Dismissal, however, remains "purely discretionary." *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c).

Here, neither the interests of judicial economy nor the avoidance of multiplicity of litigation outweighs this Court's concern over needlessly deciding state law issues. The undersigned finds no reason for this Court to hold a trial addressing the alleged state law claims. To the extent that the complaint alleged any state law claims, those claims should be brought in state court.  Accordingly, if the Court adopts the recommendation granting defendants' motion for

summary judgment on all remaining federal claims, then the Court should dismiss Schwab's state law claims as well.

### V.    Recommendation

For the reasons set forth above, I respectfully recommend that motions for summary judgment filed by defendants Corizon, Dr. Yacob, Dr. Flentje, and N.P. Sherwood (ECF No. 56) and Sheriff LaJoye-Young (ECF No. 60) be **GRANTED**.

I further recommend that plaintiff's state law claims be **DISMISSED** pursuant to 28 U.S.C. § 1367.

I further recommend that this case be **TERMINATED**.


Dated: August 24, 2022                        /s/ Ray Kent
                                              RAY KENT
                                              United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).